IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 15, 2005 Session


**DONITA DALE DOWDEN v. RONALD J. FEIBUS**


**Appeal from the Circuit Court for Hamilton County**
**No. 02-D-1607     Jacqueline E. Schulten, Judge**


**No. E2004-02751-COA-R3-CV - FILED JANUARY 18, 2006**


After fourteen years of marriage, Donita Dale Dowden ("Wife") sued Ronald J. Feibus ("Husband") for a divorce. After trial, the Trial Court entered its Final Decree, *inter alia*, awarding Wife a divorce, dividing the parties' marital property, and ordering Husband to pay Wife alimony in futuro of $1,000 per month. Husband appeals claiming that the Trial Court erred in awarding Wife alimony in futuro instead of rehabilitative alimony, in awarding Wife 50% of Husband's federal pension when a portion of that pension was earned prior to the marriage, and in dividing an award that Husband received from a personal injury lawsuit. We affirm.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**


D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.


Ronald J. Berke, Chattanooga, Tennessee for the Appellant, Ronald J. Feibus.


Bruce C. Bailey, Chattanooga, Tennessee for the Appellee, Donita Dale Dowden.

# OPINION

## Background

Husband and Wife were married on October 29, 1987. In August of 2002, Wife sued Husband for divorce claiming, among other things, that she was entitled to a divorce on the grounds of either inappropriate marital conduct or irreconcilable differences. The case was tried in late March and early April of 2004.

At the time of trial, Husband was 56 years old and Wife was 43 years old. Husband is an attorney who currently holds a position as an United States Administrative Law Judge. Wife is a legal secretary. After they were married, the parties lived in Georgia from 1987 until 1991. When they left Georgia, the parties moved to Miami, Florida so Husband could advance his career and go into partnership with another attorney. The parties lived in Miami for approximately a year and a half and then moved to Orlando, Florida where they lived from 1992 until 2001. In 2001, the parties moved to Chattanooga, Tennessee so Husband could become an administrative law judge.

Wife testified that she was working for a temp service and Husband was an attorney when they met. Wife holds a Bachelor of Science degree in business from the University of Mississippi and worked as a secretary and as an office manager during the marriage. Wife testified that in Georgia, she worked as a secretary and eventually became an office manager and was earning $40,000. Wife testified she worked as a secretary and made $35,000 when they lived in Miami. Wife testified that prior to moving to Chattanooga, she worked as the secretary to the president of a real estate firm and testified: "I was making in the low fifties as my base salary and with overtime one year, the year before we left I think I made fifty-seven or fifty-eight." After the parties moved to Chattanooga, Wife found a job at the Humane Society and worked there from April of 2002 until August of 2002, when she left Husband. Wife testified that she made $10 an hour working 20 to 32 hours a week at the Humane Society. After she filed for divorce, Wife obtained a job at American Bicycle Group as the secretary to the president and made $45,000 a year. However, Wife claimed that she quit her job at American Bicycle Group prior to trial due to a hostile work environment. At the time of trial, Wife was working as a legal secretary for a law firm. She testified that she earns $33,000 per year at her current job with an opportunity for overtime. Wife introduced an Income and Expense Statement that showed that her monthly net income totals $2,230.61 and her monthly expenses total $3,915.54, resulting in a shortfall of $1,684.93 per month.

Wife also testified that during the marriage, she would give Husband a set amount of money each month toward the household expenses. Wife admitted that during Husband's career as an attorney, the amount of income the parties reported to the IRS was approximately the same for Husband as it was for Wife. Wife testified that when the parties moved from Orlando to Chattanooga and she obtained a job at the Humane Society,

[Husband] wanted me to get a job that made more money so I could start contributing money to the household, but our agreement when we came here was that - - at first it was I didn't have to work at all. Then it was I would work part-time and possibly go to school because I had wanted to go to law school for years and he had always said no, that we didn't have the time or didn't have the money, that I needed to work.

And since our circumstances were changing this was going to be an opportunity where I could probably do that. But when we came [to Chattanooga] he said no, that I couldn't [go to law school].

She further stated: "I had discussed going to law school from time to time with [Husband] and he said that when we became more financially stable I could go to law school and work part-time." When Wife was questioned about steps she has taken toward achieving her stated goal of going to law school, Wife testified:

I have been a nervous wreck since I left my husband and I've just been trying to get a job and get my life settled. There's no way that I could handle going to law school right now. Maybe after I get this divorce I'll finally be able to go.

Wife testified that she and Husband were separated in 1997 for a couple of months. Wife admitted that during this separation, she met another man and had a relationship with him. Wife testified that she left Husband again on August 5, 2002, and admitted that almost a year later, she began a relationship with another man. Wife admitted that she had sexual relations with this man.

Regarding her reasons for leaving Husband, Wife testified:

[Husband] demanded that I vacuum the house every day, that I clean the baseboards once a week, that I clean the air vents once a week, that I clean the blinds once a week, that I change the linens on our bed twice a week, that I cook every day, that I scrub the bathrooms once a week and if I didn't do it to his standards he would ridicule me, tell me that I was a worthless piece of - - he would tell me that I was stupid, that I was no good.

And he would do what I call the white glove test and he would walk along the furniture and rub his finger across it and if he found dust he would come after me and back me against a wall screaming and yelling at me like a drill sergeant with his arms up so I couldn't escape and telling me how stupid and worthless I was.

Wife testified that behavior such as she described would happen "almost all the time … almost on a daily basis."

Wife further testified that in 1998, Wife's 13 year old cousin Heather came to live with the parties. Heather lived with the parties until she was 17 years old and during that time, Wife and Husband acted as Heather's parents. At trial, Wife alleged that Husband's behavior toward Heather was inappropriate. Wife testified that Husband allowed Heather to see him when he was naked, but that Wife was unaware that this was happening until discovery was conducted during this lawsuit. Wife testified that she also learned that Husband had shown Heather a photo of himself naked. Wife also testified that when Heather was 16, Husband took her to a gynecologist to obtain birth control pills, but that Wife was unaware of this until later. Wife claims that in July of 2002, she asked Husband why he was going into 17 year old Heather's bedroom in the middle of the night, and he told her he was going in to comfort Heather. Wife testified that she helped move Heather to Mississippi to live with other family members shortly before Wife left Husband. Wife testified that she has not maintained contact with Heather since Heather moved to Mississippi.

Wife also claims that she discovered pictures of naked children on Husband's computer before the parties moved to Chattanooga. Wife testified that she did nothing after discovering these pictures.

Heather Lynn Chandler, who was 18 years old at the time of trial, testified. Heather testified that she attends college and lives in an apartment during the school year. Heather testified that during the summer, she stays with Husband. Heather testified that she has a debit card that has overdraft protection from Husband's account and that Husband sometimes allows her to drive his car and keep it for a night or two.

Heather testified that while she lived with the parties, Husband sometimes would come into her bedroom in the middle of the night. Heather denied that Husband had conversations with her about sex when he came to her room at night, but admitted that she had told Wife that Husband would come to her room at night and talk to her about sex. Heather admitted that Husband has had conversations with her about masturbation. Heather testified that Husband never touched her inappropriately.

Heather testified that Husband did not like her to wear thong underwear "because I had a skirt for school and he thought that it would - - you know, obviously if the wind blew or something …." Heather testified that Husband asked her a couple of times if she was wearing thong underwear.

Heather testified that while she lived with the parties, she would sometimes go into the bathroom while Husband was taking a shower to talk to him. Heather testified that the glass shower would be "steamy" so she could not see him. Heather admitted that she sometimes was in the bathroom after Husband turned off the water in the shower but stated "there's always two towels draped right here (indicating), that's where he hangs them, and so even if he's standing right there this is blocked and I can't see anything there. So when he would pull off the towel I wouldn't ever see anything. This is all fogged up." Heather testified that even though she was in the bathroom while he showered, she never saw Husband naked.

Heather testified that when she was 17 years old and still living with the parties, Husband showed her a photo of himself naked. However, Heather stated that Husband "had his thumb over the part where he was naked and I saw his face and his toes and legs and arms." Heather testified that just prior to Husband showing her the photo, she had been on the bathroom floor "doing my toenails" and Husband had "recently gotten out of the shower."

Heather testified that in January of 2003, Husband started visiting her in Mississippi. Heather also testified that she went on a trip to New York with Husband during her break from school in the fall of 2003. During that trip, Heather and Husband stayed together in a single hotel room with two separate beds. Heather testified that Husband purchased a promise ring for her because she promised to be abstinent.

Husband testified regarding allowing Heather to be in the bathroom while he showered. He stated:

> You can see a body is in there, but I don't think that's really the point …. The point is, an older person who is your parent person, it's just not a shameful thing. It's not sexual. It's not obscene. It's not pornographic. It takes a sick mind to turn that into it, and I'm just not going to play that game. I don't know if she could see through the glass or not and I don't care.
>
> And I didn't go to her. I never left my bathroom. I don't walk around the house naked. I sleep without clothes. I go to my bathroom. I dress. I leave. I never - - unless the house is on fire or an emergency in the middle of the night, because I sleep naked, I would not be seen naked outside of my bathroom. And if Heather felt comfortable, for whatever reason, coming in talking, sticking her head in, whatever, I'm fine with it. And she did it when [Wife] was in the shower. She did it when I was in the shower. I don't see it as being any big thing. I don't get it.

When asked about showing Heather a naked photograph of himself, Husband testified:

> Heather was on the floor doing something and she started picking on me. I think I might have stepped on scale to look at my weight. And she said, you're buff. And I said, buff like good? No. Buff like bald, ugly and fat. And, you know, she was picking on me. And, I said, I used to be better looking. And she said, I doubt it. So I just got the idea in my head to go get this picture, which I really like of me at a time when I was really happy, and when (sic) and got the picture, which I knew she had seen because she'd been through all my stuff before. And I covered the lower half of the picture and I said, that's the face of a handsome, young man. You probably don't see it, but that's what I used to look like.

Husband further stated: "I don't flaunt nudity in front of the child. It's not important to me."

As for the allegations regarding his visits to Heather's room at night, Husband testified:

> I would hear her crying. She would just cry inconsolably. Her room was right next to where I sat and watched TV. And I'd go in and I would say, is there anything I can do? Can you tell me about it? She's too young and she just couldn't explain how bad she felt. So I would just lay down on the bed next to her and hold her hands sometimes and just talk and then she would fall asleep. Sometimes I fell asleep.

Husband also testified:

> I got some information on masturbation because, you know - - I mean, I certainly relate to young men and masturbation and I didn't know for sure if that was something that would be totally appropriate for women. I asked my wife and she wasn't terribly informative. So I got some information and I broached the subject because I felt like Heather was a little repressed sexually. I don't think she was so much repressed as she just didn't want to talk about it.

When asked about taking Heather to see a gynecologist, Husband testified "since I didn't have a woman to talk to her about it, I called the doctor that she had been seeing. The same one, I think, that [Wife] saw at one time."

Husband testified that the first time he heard Wife mention that she wanted to go to law school was in March of 2002. He testified:

> She announced it one day actually, just talked to me in talking. She was having trouble getting a job and she had turned down a job at Brach because the people were not up to her standards. Brach Candy. And I was very frustrated and she said, well, you know, I think I want to go to law school, and I said, well, when did that come up? And she said, well, I've always thought about it, but I just didn't know if it was the right time or whatever. I don't know. And I said, well, this isn't - - what's your plan? She said, well, I wanted to go to the University of Mississippi. I said, well, would you live with your mother? She said, no. I want to live in my own home. I said, well, how do I fit into all of that? Are you going to go away for three years? I said, do you have any idea what it costs? She said, no. I said, well, it would be at least $15,000 a year to do that for three years. I said, would you live there? She said, yes. I said, well, I don't understand how that fits into our relationship. And she said, well, I want to look into it, and I said, fine.
>
> And sometime shortly thereafter, she came on a ride with me to Rome, Georgia where we officiate hearings, one of our remote sites, and she went to the library and I'm given to understand - - she told me that she tried to take a L-SAT … or something off the computer and she didn't like the test very much. And I never

heard anything more about it after that. That's all I know.…She just said she didn't like the test. I don't remember the exact words, but my impression was that it was not a test that she enjoyed taking.

Husband testified that he currently makes an annual gross salary of $114,934 per year. Husband also testified that prior to the marriage, he worked for the federal government for approximately fourteen months. Husband testified that during the marriage, when he was working as an attorney, he was making "[f]orty, 50,000 a year, plus I was able to pay life, health, and disability out of the partnership. So about 60 to 70,000 a year."

Husband testified that when the parties first married, they lived in a house that he owned. Husband testified that every house they purchased since he sold that house has been jointly owned. However, Husband testified that he "would point out that in every instance, I informed her very clearly that the first $50,000 of equity was my money. That was never not said." Wife disputes that Husband ever told her when they purchased houses that he got to keep $50,000 of the equity.

During the marriage, Husband was involved in an automobile accident that resulted in a lawsuit. In 1998, Husband received an award of $135,000 for pain and suffering as a result of this suit. Husband testified that he used this money to reduce the mortgage on the parties' house in Orlando, where they were living at the time. Husband stated: "I had always kept our assets separate and I told [Wife] I was reducing [the mortgage] to relieve the burden on our finances. So it was to be mine if and when we sold the house." Wife disputes that Husband ever told her this.

On May 19, 2004, the Trial Court entered its Final Decree incorporating by reference the Trial Court's memorandum opinion. The Final Decree, *inter alia*, awarded Wife an absolute divorce from Husband; ordered Husband to pay Wife alimony in futuro of $1,000 per month; and divided the parties' assets and liabilities. In its memorandum opinion, the Trial Court found and held, *inter alia*:

During the course of the marriage, the parties lived in several different cities, including Miami, Orlando, Alpheretta, GA, and Chattanooga. Each of the moves was to further the Husband's career as an attorney.

* * *

Wife's highest earnings were $35-40,000. Wife had recently left a job making $45,000 a year at American Bicycle due to what she termed sexual harassment on the job. Wife was employed briefly at a lesser paying job before being employed at the time of the trial as a legal secretary earning $35,000 annually.

Wife complains of Husband's ridiculing, screaming and berating of her. Wife complains of his requirement that she vacuum the house everyday, that she clean baseboards, blinds and baths at least once a week, and in general "made her life

-7-

miserable". Wife admits to at least one affair during the marriage. The parties separated for the final time in August of 2002.

Approximately six years ago, the Wife's second cousin came to live with the parties as a foster child. The parties raised that child as their own. An enormous amount of testimony was proffered on whether the now adult foster daughter is or was being molested by Husband. Whether that happened or not, is not a decision that needs to be reached by this Court. Apparently, it was the intent of [Wife] to prove this as one of the basses of his inappropriate marital conduct. However, the record was replete with other proof documenting that [Wife] is entitled to a divorce. [Husband] did not counter-sue for divorce.

* * *

Husband asserts that the $50,000 equity he received from his pre-marital home (which sold after the marriage) is his separate property, as is the $135,000 he put into one of the marital homes, from a personal injury lawsuit. The Court disagrees. The Court specifically finds that the monies which the Husband put into the parties' homes over the years, were co-mingled and the money transmuted into marital assets. All of the home[s] purchased by the parties during the marriage were in joint names.

* * *

Given all the above factors, the Court divides the property of the parties as follows:

| ASSETS: | HUSBAND | WIFE |
|---|---|---|
| * * * | | |
| ½ of the house equity | $130,500.00 | $130,500.00 |
| * * * | | |
| ½ of Administrative Law Judge Government Pension through the date of this Final Decree | Value unknown | Value unknown |
| * * * | | |
| TOTAL | $210,974.50 | $203,398.50 |
| * * * | | |

-8-

ALIMONY

Wife has requested periodic alimony. Husband testified he has residual pain in his neck running down his right arm due to an old automobile accident, he has also had his thyroid removed and has developed double vision. An Optometrist testified on his behalf, Dr. Joe Dzik, who opined that [Husband] may have anywhere from one to three years to work before he would be unable to read the amount of documents that he needs to read for his job as an Administrative Law Judge. The Court finds that the Wife is in need of periodic alimony due to the following factors pursuant to T.C.A. § 36-5-101: 1) the duration of the marriage; 2) the standard of living of the parties established during the marriage; 3) the various earning capacities of the parties; 4) the relative education and training of the parties; 5) the relative fault of the parties.

Husband earns approximately $114,000.00 a year, Wife earns approximately $35,000 a year. The highest wages she ever earned in her life were $45,000 a year.[1] Wife is in need of periodic alimony. The Court will award her the amount of $1,000.00 per month as periodic alimony, reviewable by this Court if the need arises due to Wife's needs and Husband's ability to pay and his health issues.

Husband appeals to this Court.

## **Discussion**

Although not stated exactly as such, Husband raises three issues on appeal: 1) whether the Trial Court erred in awarding alimony in futuro instead of rehabilitative alimony; 2) whether the Trial Court erred in awarding Wife one-half of Husband's federal pension when part of this pension was earned prior to the marriage; and, 3) whether the Trial Court erred in awarding a division of Husband's 1998 personal injury award.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

---

[1] We note, however, that Wife testified to having made $57,000 or $58,000 in the year before the parties moved from Florida to Tennessee. This does not negate the Trial Court's finding as to Wife's need based upon her current earning capacity.

We first address whether the Trial Court erred in awarding alimony in futuro instead of rehabilitative alimony. Because the amount of alimony to be awarded, if any, is within the sound discretion of the trial court in light of the particular circumstances of the case, appellate courts will not alter such awards absent an abuse of discretion. *Lindsey v. Lindsey*, 976 S.W.2d 175, 180 (Tenn. Ct. App. 1997). Our Supreme Court discussed the abuse of discretion standard in *Eldridge v. Eldridge*, stating:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. *Id.* When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Id.*

As pertinent to Husband's first issue, Tenn. Code Ann. § 36-5-101[2] provides:

> [W]here one (1) spouse suffers economic detriment for the benefit of the marriage, the general assembly finds that the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.
>
> (C) It is the intent of the general assembly that a spouse who is economically disadvantaged relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties. Where there is relative economic disadvantage and

---

[2]We discuss and apply the version of Tenn. Code Ann. § 36-5-101 in effect at the time of this divorce.

rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection (d), the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). An award of periodic alimony may be made either in addition to a rehabilitation award, where a spouse may be partially rehabilitated as defined in this subdivision (d)(1)(C), or instead of a rehabilitation award, where rehabilitation is not feasible. When appropriate, the court may also award transitional alimony as provided in subdivision (d)(1)(D).

\* \* \*

(D) Transitional alimony means a sum of money payable by one (1) party to, or on behalf of, the other party for a determinate period of time.…Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.

Tenn. Code Ann. § 36-5-101(d)(1) (Supp. 2004).

The factors to be considered in deciding whether to award alimony are contained in Tenn. Code Ann. § 36-5-101(d)(1)(E) and include:

(i) The relative earning capacity, obligations, needs, and financial resources of each party including income from pension, profit sharing or retirement plans and all other sources;

(ii) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(iii) The duration of the marriage;

(iv) The age and mental condition of each party;

(v) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(vi) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

-11-

(vii)   The separate assets of each party, both real and personal, tangible and intangible;

(viii)   The provisions made with regard to the marital property as defined in § 36-4-121;

(ix)   The standard of living of the parties established during the marriage;

(x)   The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(xi)   The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so;  and

(xii)   Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-101(d)(1)(E) (Supp. 2004).

As this Court discussed in *Dube v. Dube*:

While all relevant factors must be considered when setting the amount of an alimony award, need and the ability to pay are the critical factors.  *Robertson*, 76 S.W.3d at 342.  Discussing the intent behind alimony, our Supreme Court has held: "the purpose of spousal support is to aid the disadvantaged spouse to become and remain self-sufficient and, when economic rehabilitation is not feasible, to mitigate the harsh economic realities of divorce."  *Burlew v. Burlew*, 40 S.W.3d 465, 470-71 (Tenn. 2001) (quoting *Anderton*, 988 S.W.2d at 682).

Although "the legislature has demonstrated a preference for an award of rehabilitative alimony[,]" *Crabtree v. Crabtree*, 16 S.W.3d 356, 358 (Tenn. 2000), the relevant alimony statute, Tenn. Code Ann. § 36-5-101(d)(1), does contemplate, under the appropriate circumstances, a long-term award of alimony, or alimony *in futuro*, providing: "[w]here there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, . . . then the court may grant an order for payment of support and maintenance on a long-term basis . . . ." Tenn. Code Ann. § 36-5-101(d)(1). "[T]he purpose of [alimony *in futuro*] is to provide financial support to a spouse who cannot be rehabilitated."  *Burlew*, 40 S.W.3d at 471.

*Dube v. Dube*, 104 S.W.3d 863, 869 (Tenn. Ct. App. 2002).

Husband argues, in part, that Wife is capable of rehabilitation, and, therefore, the Trial Court should have awarded rehabilitative alimony, not alimony in futuro. Husband bases his argument, in large part, on the fact that Wife testified that she wanted to attend law school. This evidence, however, is insufficient to prove that Wife is capable of rehabilitation. The fact that an individual, such as Wife, states that she would like to be a lawyer, or a doctor, or a teacher, or a PGA tour player, or any such profession is, in and of itself, no proof that that individual has the capabilities to do so. While the desire to be such a professional is a necessary requirement to achieving that goal, it is by no means the sole requirement. Here, no proof was introduced that Wife was capable of getting into law school or of completing the curriculum.

We believe that reasonable minds could disagree as to the propriety of the decision made by the Trial Court to award alimony in futuro, the very essence of a discretionary decision. The evidence in the record before us shows that Wife suffered economic detriment for the benefit of the marriage as she left numerous jobs so that Wife and Husband could move to some place new to enable Husband to advance his career. The evidence shows, as found by the Trial Court, that Wife has need and Husband has the ability to pay. We have thoroughly reviewed the record and cannot say that the evidence preponderates against the Trial Court's findings relative to the issue of alimony. In addition, the Trial Court considered the relevant statutory factors. Given this, we will not substitute our judgment for that of the Trial Court, and we find no abuse of discretion in the award of alimony in futuro. We, therefore, affirm the alimony award.

We next consider whether the Trial Court erred in awarding Wife one-half of Husband's federal pension when part of this pension was earned prior to the marriage. Courts must look to Tenn. Code Ann. § 36-4-121 when determining how to distribute property in a divorce. In pertinent part, Tenn. Code Ann. § 36-4-121 provides:

> (a)(1) In all actions for divorce or legal separation, the court having jurisdiction thereof may, upon request of either party, and prior to any determination as to whether it is appropriate to order the support and maintenance of one (1) party by the other, equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just.

> * * *

> (b) For purposes of this chapter:

> (1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing . . .

> * * *

-13-

(2) "Separate property" means:

(A) All real and personal property owned by a spouse before marriage,…

* * *

Tenn. Code Ann. § 36-4-121 (Supp. 2004).

In an action for divorce, a Trial Court may "equitably divide, distribute or assign" only the marital property, not separate property. That portion of Husband's federal pension earned prior to the marriage constitutes his separate property.

Husband contends that the Trial Court divided his entire federal pension including that portion earned pre-maritally. As we read the Trial Court's Memorandum Opinion, the Trial Court awarded each party "½ of Administrative Law Judge Government Pension through the date of this Final Decree." Husband became an administrative law judge after the parties married, but before Wife filed for divorce. As such, the Trial Court distributed only that portion of Husband's federal pension earned from the date Husband became an administrative law judge to the date that the Trial Court granted the divorce. Thus, the Trial Court did not award Wife any portion of Husband's federal pension earned prior to the marriage. If there should be any ambiguity as to exactly what the Trial Court held on this, we specifically find and hold that the Trial Court awarded Wife only one-half of that portion of Husband's federal pension earned from the date Husband became an administrative law judge to the date of the divorce decree. We find no error in the Trial Court's award to Wife of one-half of that portion of Husband's federal pension earned during the marriage.

Finally, we consider whether the Trial Court erred in distributing as part of the marital property Husband's 1998 personal injury award. In pertinent part, Tenn. Code Ann. § 36-4-121 provides that separate property includes "[p]ain and suffering awards …." Tenn. Code Ann. § 36-4-121(b)(2)(E) (Supp. 2004). However, our Supreme Court discussed the concepts of marital property and separate property in *Langschmidt v. Langschmidt* and noted that in addition to the statutory provisions contained in Tenn. Code Ann. § 36-4-121(b), Tennessee intermediate appellate courts have recognized two methods by which separate property may be converted into marital property. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002). These two methods are commingling and transmutation, which the Supreme Court noted have been described by this Court as follows:

> [S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not

occur.... [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property.... The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt*, 81 S.W.3d at 747 (citations omitted).

The evidence shows that during the marriage Husband was involved in an automobile accident that resulted in a lawsuit and that in 1998, Husband received an award of $135,000 for pain and suffering as a result of this suit. The evidence further shows that Husband used this money to reduce the mortgage on the parties' house in Orlando, where they were living at the time. The house in Orlando was owned jointly by Husband and Wife. Thus, a presumption was raised that Husband either commingled the pain and suffering award with the marital funds invested in the marital home, or transmutted the pain and suffering award into marital property by using it to pay down the mortgage on the marital property.

Although Husband testified that he told Wife that the pain and suffering award would remain his separate property, Wife strenuously denied this assertion. "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999) (quoting *Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn.1998)). The Trial Court specifically found "that the monies which the Husband put into the parties' homes over the years, were co-mingled and the money transmuted into marital assets." Clearly, the Trial Court found Wife more credible on this issue.

Husband did not rebut the presumption that, many years ago, the pain and suffering award either was inextricably commingled or had become transmuted from his separate property into marital property. We do not find the evidence to preponderate against the Trial Court's findings relevant to this issue. As such, we hold that the Trial Court did not err in dividing what once was the pain and suffering award as marital property when it divided the equity in the parties' marital home.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Ronald J. Feibus, and his surety.

_____
D. MICHAEL SWINEY, JUDGE